### Charles Hinkley Baker, Appellant, v. Howard W. Baker et al., Appellees.

### Gen. No. 16,448.

1. EVIDENCE—*effect given to admissions.* Admissions shown for the purpose of establishing important agreements are received with caution, and where writings exist which tend to contradict the admissions in question, the verity of the fact sought to be established by the admissions must be shown by clear and convincing evidence.

2. PARTNERSHIP—*what essential to establish existence of relation.* When the fact of co-partnership is in issue as between the partners, courts will not proceed on conjecture, but strict proof is required.

3. CONTRACTS—*effect of failure to bring action within limitation period fixed by contract.* If an action to enforce alleged rights under a contract is not brought within the time limited by such contract for the bringing of an action, the same becomes barred. *Held,* under the evidence, that there was no waiver of the limitation period of the contract in question in this case and no representations, acts or conduct which induced the action of the complainant in this case in not bringing his action within the time stipulated.

Bill in chancery. Appeal from the Superior Court of Cook county; the Hon. ALBERT C. BARNES, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1910. Affirmed. Opinion filed May 5, 1911. *Certiorari* denied by Supreme Court (making opinion final).

JAMES HAMILTON LEWIS and ELIJAH N. ZOLINE, for appellant; WALLACE STREETER, of counsel.

CUSTER & CAMERON and TIMOTHY F. MULLEN, for appellees.

MR. PRESIDING JUSTICE SMITH delivered the opinion of the court.

This cause has been before this court on appeal from a decree sustaining a demurrer to the second amended bill and dismissing the bill for want of equity. Baker v. Baker, 139 Ill. App. 217. In the opinion of the court filed on that appeal the substance of the bill is stated, and there is no necessity of restating it here. It appeared in that case that at the time the court sustained the demurrer the complainant moved for leave to amend the bill and the court denied the motion. This was held to be error on the showing made in support of the motion, and the decree was reversed and the cause was remanded with directions to permit the proposed amendments to be made.

Upon the case being redocketed in the Superior Court the amendments were allowed to be filed. Answers and replications thereto were filed, and the cause proceeded to a hearing on the merits, at the conclusion of which a decree was entered dismissing the bill for want of equity.

Two principal questions are presented in this case; first, whether there was a co-partnership as alleged in the bill; second, whether the cause of action is barred by the limitation clause of the trust agreement shown in the bill.

The partnership averred in the bill is claimed to

have been formed by a parol agreement in 1894 or 1895. The averments of the bill as to the terms and conditions of the partnership agreement are indefinite and not wholly consistent. The evidence offered by the complainant in support of the bill is not consistent. The claims made in the proofs and oral arguments presented to us, sometimes assert that the partnership was to consist of an interest in the stocks of the companies referred to, after William T. Baker, the deceased, had either withdrawn from the enterprise the money which he had advanced, or after he had taken therefor the bonds of the company. Then again it is urged in argument that the partnership was to take effect after the enterprises described in the bill had progressed in their development to the point where they were assured financial successes; and on the other hand it is claimed that the partnership was formed at the beginning of the Snoqualmie Falls enterprise, and it involved an interest on the part of the complainant in the main enterprise and collateral enterprises, including the moneys put in by Wiliam T. Baker, the complainant furnishing the opportunity and option, and engineering services necessary to construct the plant or plants, and the deceased, William T. Baker, furnishing the moneys necessary to start and conduct the business. A further theory is also advanced that the deceased succeeded to the interest of Mr. Powers in the enterprise.

The evidence relied upon by the complainant to establish the existence and terms of the partnership consists in what is claimed to be expressions in letters written by William T. Baker, the deceased, to the complainant, in which the expressions "our" or "we" are used, and in admissions proved to have been made to sundry parties in conversations between them and William T. Baker. In these conversations it is shown that William T. Baker stated, under various circumstances and on various occasions, that the complainant owned a half interest in the Snoqualmie

Falls project and that they were joint partners, the son and father having each a half interest. The various witnesses who testified to these admissions on the part of William T. Baker in some instances state the proportions in which the property was stated to be owned between the father and the son, and in some instances no particular proportions are named or referred to. Nowhere in the evidence on behalf of the complainant is any definite date fixed at which the partnership commenced, nor is there any proof of the terms of the alleged co-partnership agreement further than is indicated above.

The evidence on behalf of the defendants on this issue consists quite largely of the correspondence between the complainant and William T. Baker. These letters are the only written evidence of the business relations of the complainant and his father to each other or to the enterprise involved in the case; and in our judgment they are far more conclusive and convincing than the casual admissions or statements of William T. Baker under various circumstances shown by the testimony of the very reputable witnesses who testify to such statements or admissions.

Considering the circumstances under which the letters in evidence were written, and the probability that in the course of the extensive correspondence that was had between William T. Baker, who was advancing large sums of money in the enterprises, and the complainant, who was in the field of operations at a great distance from Chicago, where William T. Baker lived, it seems to us that had there existed a co-partnership relation between the father and son in the enterprises involved in the litigation, some clear expression or intimation would have been made, particularly by the complainant, of such partnership relations. In this correspondence would be the natural place to look for evidence of the co-partnership in the absence of a written agreement. The evidence is clear out-

side of the correspondence, and indeed it is conceded, that the title to all the property was taken in the name of William T. Baker and remained in his name until corporations were formed and the properties were transferred to the different corporations so organized; and that then all the certificates of stock in the corporations were issued to William T. Baker. In all the correspondence we find no existence, or suggestion even, of any co-partnership relation between complainant and his father, nor do we find any reference to any such relations. On the contrary, the context and direct expressions in the correspondence clearly point to the fact that the complainant was the local manager and engineer in charge of the work and business, and was receiving from his father a salary for such work. The complainant's letters repeatedly refer to the property and the enterprises as belonging to William T. Baker alone.

It is freely admitted on the part of the defendants that there may have been, and that there probably was, an intention on the part of William T. Baker to give the complainant an interest in the enterprise in consideration of the fact that he was the originator of the Snoqualmie Falls scheme and had contributed the engineering ability and services and time necessary to develop it, at a salary not commensurate with the ability displayed and the responsibility assumed by him, when the enterprise and business had developed to a point, and the circumstances were such, that an interest might be safely and properly given to the complainant. But the contention of the defendants is, and we think the proof shows, that up to the time of William T. Baker's death the enterprise had not reached the state when William T. Baker in his judgment deemed it advisable to carry out any such intention, if he had it. The evidence shows, on the contrary, that at the time of the death of Mr. Baker the Snoqualmie Falls enterprise was in a desperate finan-

cial condition, and not only was that true, but Mr. Baker himself was in a precarious financial condition and on the verge of failure, and that this situation was due largely to the very considerable amount of money which he had been compelled to expend and use in the promotion of the enterprise; that at that time it had not only not reached the point of assured success, but large amounts of money were still required to complete it and put it in a condition where it would begin to produce returns. It is doubtless true that the death of Mr. Baker tied the hands of his creditors for a year, and thus made it possible for the representative of the estate to interest outside capital, which saved not only his estate from bankruptcy, but the enterprise in question from failure. The complainant himself profited by the securing of this money through Harris & Company to the extent of his interest in the estate. He showed his appreciation of the situation by refraining from taking any steps which might create any suspicion or doubts in the minds of Harris & Company, who were furnishing the additional funds necessary to finance the project, under the trust agreement signed by the heirs and representatives of the estate.

On August 12, 1901, complainant wrote to his father: "Until I talked with you last month it never occurred to me that for my idea and the promotion of the scheme I was to get nothing, although you think my having been employed was sufficient compensation." This is singular language for complainant to use if it was a fact, as alleged, that for years an arrangement had existed between them by which he was to have, or had, a one-half interest in the scheme. The letter further says: "If a stranger had been associated with you in the work he would have had a promoter's interest of at least ten per cent, to which he would have been entitled, but to me this is denied." August 16, 1901, William T. Baker wrote to complain-

ant in reply to the above: ''Your letter of the 12th came this morning and my first impulse on reading it was to return it to you. You know perfectly well that I have always done for you everything you have asked that was in my power to do. * * * When we were talking about doubling the stock for doubling the plant you asked if I would not give you some stock then, and I told you only that all of it would eventually go to you and the other children.'' And further on in the same letter he says: ''There have been times when I would have considered a proposition to sell simply because I was near being wrecked by it, and I have made many sacrifices that you know nothing about, and would not appreciate if you did, for your sake and that of the other children.''

In the last paragraph of this letter he further says that he never felt it necessary to say what he would do if the plant ever reached a condition where he did not have to put money in it and could see some of the promised revenue coming to him, and suggests that complainant should have some of the patience that he has had to exercise and should trust him ''for the rest.''

We find appellant in his letter to his father of July 4, 1902, saying: ''Apropos to the sale of the company which you wish to effect, I write to ask you what my share will be as original promoter of the project.''

These extracts from letters written in 1901 and 1902 by the parties (samples of what appears in many letters) clearly indicate their relations at that time to the business in question and to each other. The subsequent correspondence shows no change in their relations.

We do not think that a court of equity can infer a co-partnership existing in this case upon the proof shown in the record. We think the reliable and most reasonable evidence in the record negatives the existence of any such co-partnership, and warrants the

finding of the chancellor that no such partnership existed as that alleged in the bill. Evidence of admissions by parties to transactions should be clear and convincing in order to establish important agreements such as the one claimed in the bill. Courts have found it necessary to receive such admissions with caution; and if the evidence in the case contains writings of parties, as in this case, which distinctly point to a different relationship than that of co-partners, namely, to a relationship of employer and employe, the inference that any other relationship exists must be founded upon very clear and convincing evidence. When the fact of co-partnership is in issue as between the parties, courts will not proceed on conjecture, but strict proof is required. Second Bates on Partnership (Ed. 1888), sec. 1136; 30 Enc. of Law and Procedure, p. 357, 414; Gray v. Gibson, 6 Mich. 300; Chisholm v. Cowles, 42 Ala. 179; Hill v. Mallory, 112 Mich. 387; Walker v. Matthews, 58 Ill. 196.

We feel compelled to hold with the chancellor who heard the case below, that the complainant has failed to establish the co-partnership alleged in the bill.

On the second question in the case, as to whether the cause of action is barred by the limitation clause in the trust agreement set up in the bill, we are of the opinion that the evidence shows that the complainant was not induced by anything that was said or done by the defendants, or any of them, to postpone the bringing of this suit beyond the time allowed by the provisions of the trust agreement. We think the evidence establishes the fact that the defendants never waived in any manner or form the limitation clause of the agreement; but that the condition of the estate of William T. Baker at the time of his death made it absolutely necessary that the financing of the affairs of the estate, which were much involved by reason of the advancement of money and obligations incurred by William T. Baker in behalf

of and in connection with the enterprises set out in the bill of complaint, should be carried on without being embarrassed or complicated by litigation between the complainant and the other heirs of William T. Baker. This consideration appealed as strongly to the complainant as it did to the defendants in the bill, inducing him to delay the commencement of proceedings until the financiering arrangement with Harris & Company should be completed.

On October 31, 1904, just prior to the making of the trust agreement, complainant wrote to his brother Henry a letter complaining that Henry's promises had not been kept, and adding: "You were full of promises of this sort, anything to get me to be silent in regard to my claim until financial matters were adjusted, which as a matter of policy I would have done anyway." Complainant testified that he had some talk with his brother about not suing before the Harris financing was completed, because if he did sue it might upset it, and he agreed with that idea. It appears that the arrangements with Harris & Company were fully completed about September 1, 1905. The complainant, however, did nothing until the last day of the year which was allowed him by the trust agreement to commence his action, and then he instituted a suit in the federal court which was afterwards dismissed on his own motion. This bill was not filed until the 15th day of March, 1906, more than four months after the year had expired, the proceedings in the federal court being then pending.

The record shows that complainant, after the arrangements with Harris & Company were completed, did not rely upon anything that had been said or done by the defendants, or any or either of them, and did not believe that they intended to settle or adjust his claim for a co-partnership interest in the Snoqualmie Falls project, for on July 28, 1905, he wrote to his counsel inclosing his father's letters and sev-

eral copies of a "brief," and discloses in his letter the fact that he expected nothing to result from the negotiations then pending, and was simply biding his time until the Harris refunding should be accomplished, when he would commence his suit. He says in the letter: "With the Harris deal closed, if it is to be closed, I will feel that then the time has arrived for my inning, and with yourself at the bat I have no doubt that a brilliant score will result. * * * You may strike, and strike hard, and it is necessary to do so, not only that I may have what is mine, but in order to vindicate myself against the unjust and false coloring they have put me in before the people generally." This letter indicates very clearly that at the time he wrote it he reposed no confidence in his brothers and sister Bertha, or that they would settle the matter out of court.

August 31, 1905, he wrote to Howard Baker from New York, warning him not to distribute any of the money belonging to the trust, in order that the money itself might be made the subject of the litigation; and in the letter he says that he has instructed his counsel to stop any distribution, and that he intends to begin his fight, and "this is to give you notice of it."

Howard replied to this letter on September 2, 1905, saying that he had already relieved the stringency among some of the heirs by advancing them $25,000 each out of the trust fund, and that complainant had previously authorized it to be done. Thereupon complainant wrote that he had instructed his counsel to prepare the suit for reclaiming his partnership interest, and that he will go to Chicago the next week or the week following, when the suit would be filed, and "inasmuch as the year in which this has to be done is near a close, the matter can be no longer delayed."

The record shows further correspondence on the subject of the proposed suit, including a letter to de-

fendant, Henry D. Baker, prior to October 3, 1905, to which Henry replied under date of October 9, 1905, in substance that he would stand with Howard and Bertha and their counsel, and adds: ''You have never shown us any valid evidence of your claim. You will now have a chance to let the court pass on your claim.''

The next day complainant wrote to Howard, Bertha and Henry: ''We have decided among ourselves that my claim for my partnership interest in the property shall be litigated. * * * I think you are wise in letting the matter take this course, and as one of you stated while I was in Chicago, 'we can then dismiss any personal feeling in the matter and let the matter take the course of ordinary business.' '' He further advises them in this letter that he has retained ''two of the most eminent lawyers in Chicago, the best one in Seattle and an able one here'' (New York), and that suits will be begun in Chicago and Seattle soon, the preparation of them being nearly completed. The complainant testified that he had given instructions to his counsel to bring suit as soon as he could, and that he wanted it done within a year. In obedience to these instructions, the bill was filed in the United States Circuit Court November 4, 1905, within the year named in the trust agreement.

There is no ground for doubt that complainant's letters express clearly his state of mind and his purpose to bring his suit within the period named in the trust agreement; and the fact that he did bring suit within that period shows conclusively not only that he intended to so act, but, also, that he was not misled by the defendants into letting the year slip by without instituting his suit. It follows, in our opinion, that nothing was said or done by the appellees, defendants, or any of them, which rendered it impossible for complainant to bring his action within the specified time, or waived the limitation period on their part, or estopped them, or either of them, from in-.

sisting upon the failure of complainant to abide by and perform that clause of the agreement, and that complainant knew and acted upon that understanding of the situation.    The facts disclosed in the correspondence, and the bringing of the suit in the federal court bring the case fully within the doctrine of Vincent v. Mutual Reserve Fund Life Ass'n, 74 Conn. 684; McFarland v. Peabody Ins. Co., 6 W. Va. 425; Ripley v. Aetna Ins. Co., 30 N. Y. 136, and other cases. The mere pendency of negotiations during a part of the period of limitation, conducted in good faith with a view to a compromise is not a waiver of the limitation and will not estop the party for whose benefit it was made from setting up the defense.    Phoenix Ins. Co. v. Lebcher, 20 Ill. App. 450.    Early in September, 1905, the correspondence shows that complainant had instructed his counsel to commence suit for his partnership interest.    The efforts at compromise were therefore ended in ample time for action to be brought and complainant in fact filed his bill in the federal court.    Phoenix Ins. Co. v. Lebcher, *supra;* Garido v. American Cent. Ins. Co. (Cal.), 8 Pac. 512; Allen v. Dutchess Co. Mut. Ins. Co., 95 App. Div. 512; Travellers' Ins. Co. v. California Ins. Co., 1 N. Dak. 151; Garretson v. Hawkeye Ins. Co., 65 Iowa 468.

The evidence in the case, we think, warrants the conclusion, and no other conclusion, that the complainant was not induced by any representations or actions taken by the defendants to forego the commencement of this action until the limitation in the trust agreement had expired, and therefore, that there was no waiver of the agreement on the part of the defendants, nor are they estopped by anything that was said or done by them from insisting on the terms of the agreement.    The limitation clause in the trust agreement has been held in Baker. v. Baker, *supra,* by this court, a valid and binding agreement.

For reasons stated the decree is affirmed.

*Affirmed.*